COURT OF APPEALS
DECISION
DATED AND FILED

**July 16, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1738-CR**

Cir. Ct. No. **2016CF1357**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CHARLES R. STEADMAN II,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Marathon County: MICHAEL K. MORAN, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Charles R. Steadman II, appeals from a judgment, entered following a jury trial, convicting him of first-degree sexual assault of a

child under age thirteen and from an order denying his motion for postconviction relief. Steadman argues that his defense counsel[1] was constitutionally ineffective, the State's improper comments during its closing argument amounted to plain error, and the circuit court erred by excluding evidence of a witness's bias. We reject Steadman's arguments and affirm.

## BACKGROUND

¶2    The State charged Steadman with first-degree sexual assault of a child under age thirteen based on Lucy's[2] allegation that Steadman had digitally penetrated her sometime between January 30, 2011, and May 31, 2012, when she was between ten and eleven years old.[3] Lucy did not report the sexual assault until 2016, when she told the Marathon County Sheriff's Department that Steadman had touched her when she was at Zoa Osimitz's home.[4]

¶3    Prior to trial, both the State and Steadman moved to admit expert testimony. The State intended to call Lee Shipway, a licensed clinical social

---

[1] We refer to the attorney who represented Steadman at his trial in this case as "defense counsel."

[2] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym instead of the victim's name. The State refers to the victim as "Lucy," so we will as well.

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[3] We note that Steadman was originally charged with first-degree sexual assault of a child under age twelve, but the State later entered an amended Information updating the charge.

[4] It is unnecessary for us to discuss Lucy's connection to the other individuals named in this case. All we need to recount is that Steadman was previously married to Osimitz's daughter, Noelle Steadman, and, at the time of the incident, Steadman and Noelle were both living at Osimitz's home. Because Noelle and Steadman share the same surname, we will refer to Noelle by her first name.

worker, to testify about "myths regarding child sexual assault victims, including reasons for delayed reporting." Steadman planned to call Dr. David Thompson, a psychologist. The State objected to Thompson's proffered testimony, arguing that Thompson's "purported testimony will not assist the trier of fact" because "[h]is report consists of generalized statements that are unrelated to the facts of the case and assumptions not borne out by the evidence."

¶4    The circuit court held an evidentiary hearing on the motions and ultimately decided to limit Thompson's trial testimony. The court determined that it would allow Thompson "to testify generally" but not "as to specifics of this case or any findings regarding this case in particular." The court also held Shipway to the "same standard." Thompson ultimately did not testify at trial.

¶5    Steadman's first jury trial began on September 10, 2018. Several witnesses, including Shipway, testified before the circuit court declared a mistrial due to the State's failure to "disclose [potentially] exculpatory statements of one of the witnesses or potential witnesses." After the mistrial, the State moved to expand the scope of Shipway's proposed testimony. The State explained that Shipway would also testify regarding "the effect of trauma on memory and how that affects [a victim's] recitation of the assault."

¶6    Steadman's second jury trial began on October 17, 2018. At trial, Lucy testified that she was in Noelle's bedroom playing video games when she fell asleep in bed with Steadman and Noelle. Lucy stated that she awoke to Steadman touching her stomach, and then he placed his finger into her vagina. According to Lucy, Steadman asked repeatedly "if he could do the same with his penis instead of his hand," and Lucy "continued to say no." Lucy said the assault stopped when she "kept refusing, [and] he got frustrated and just kind of rolled

over and told me to go to sleep." She also reported that the next day, Steadman picked her up from school, which was "unusual"; took her to his workplace; and told her "not to tell anyone" about what had happened the night before.[5] On cross-examination, Steadman questioned Lucy about inconsistencies between her testimony and her prior statements about the assault, including her testimony at the first trial and what she reported to her family and law enforcement.

¶7 The State then called Osimitz to testify. She recalled a night when Lucy slept in the same bed as Steadman and Noelle at her home. According to Osimitz, Steadman suggested that Lucy could sleep in the bed with him and Noelle. Osimitz also asserted that on the morning after Lucy slept over, Steadman picked Lucy up from school. During cross-examination, Steadman questioned Osimitz regarding Steadman and Noelle's pending divorce as well as inconsistencies between Osimitz's testimony and prior statements to law enforcement.

¶8 Shipway testified generally about why children delay reporting sexual assaults or may not report them at all. She also briefly discussed the effects of trauma on a person's ability to remember events. During cross-examination, Shipway conceded that she did not know or treat Lucy and that the State was paying her for her testimony.

¶9 The State also called a deputy and a detective with the Marathon County Sheriff's Department, who testified, respectively, about taking Lucy's

---

[5] The State also called one of Steadman's former coworkers, who testified that "Steadman brought a [female] child with him to work" on one occasion during the time period at issue.

initial statement and investigating her sexual assault allegations. On cross-examination, defense counsel questioned the officers about the differences between Lucy's statements to them, including her age and grade when the assault happened and whether Steadman digitally penetrated her. Defense counsel also questioned the detective regarding the adequacy of his investigation.

¶10 After the State rested, Steadman called the school liaison officer for Lucy's school district. He explained that Lucy approached him in the hallway at school and told him "that she wanted to discuss an assault that she was involved in" that she had already reported to law enforcement. The officer invited Lucy to speak to him in his office, but "she never came in." Steadman did not testify.

¶11 During closing arguments, the State argued to the jury that the evidence corroborated Lucy's testimony, that Lucy was credible partially because she did not have a motive to lie, and that she was telling the truth. Steadman focused on Lucy's inconsistent statements, argued that Lucy's account was implausible and that she lied, and accused law enforcement of conducting an inadequate investigation.

¶12 The jury found Steadman guilty of the charged offense, and the circuit court sentenced Steadman to eighteen years in the Wisconsin prison system, comprised of ten years' initial confinement followed by eight years' extended supervision.

¶13 Postconviction, Steadman filed a motion alleging that his defense counsel had provided constitutionally ineffective assistance by failing to consult with Thompson regarding Shipway's opinions, failing to retain an investigator to

interview Noelle and to subpoena her as a witness,[6] and failing to object to the State's closing argument. Over the span of three days, the circuit court held a ***Machner***[7] hearing on Steadman's motion, during which defense counsel and Thompson testified. After the hearing, the court denied Steadman's motion for postconviction relief by oral ruling and later by written order.

¶14 The circuit court determined that Steadman "waive[d]"[8] his objection to the State's closing argument and that the State's comments did not constitute plain error because the comments did not "so infect[] the trial with unfairness as to make [Steadman's] conviction a denial of due process." In reaching its conclusion, the court relied on the jury instructions, which advised that counsels' arguments are not evidence. The court also observed, pursuant to our supreme court's decision in ***State v. Bell***, 2018 WI 28, 380 Wis. 2d 616, 909 N.W.2d 750, that both Steadman and the State made it clear to the jury that the case turned on Lucy's credibility.[9] The court further determined that defense counsel's "strategy in this case … to proceed without calling" Thompson was not deficient performance and that, in the alternative, counsel's decision did not prejudice Steadman. Steadman appeals.

---

[6] On appeal, Steadman has abandoned this claim.

[7] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[8] We note that "forfeiture," rather than "waiver," would be the more appropriate term under the circumstances of this case, *see **State v. Ndina***, 2009 WI 21, ¶¶28-32, 315 Wis. 2d 653, 761 N.W.2d 612 (distinguishing waiver from forfeiture), but, ultimately, the term used is of no consequence to our decision.

[9] The circuit court did not address Steadman's ineffective assistance of counsel claim related to the State's comments during its closing argument.

**DISCUSSION**

¶15    On appeal, Steadman makes three arguments that he claims entitle him to a new trial: (1) defense counsel provided constitutionally ineffective assistance by failing to consult with Thompson to evaluate a potential response to the State's expert witness; (2) certain comments the State made during its closing argument constituted plain error, or, in the alternative, counsel provided ineffective assistance by failing to object to the State's closing argument; and (3) the circuit court erred by denying Steadman the right to cross-examine Osimitz about her alleged bias against Steadman.  For the reasons that follow, we reject Steadman's claims.

## I.  Failure to Consult

¶16    Steadman argues that his defense counsel was constitutionally ineffective because he failed to consult with Thompson "to evaluate a potential response to [Shipway's] proffered bolstering testimony concerning [Lucy's] memory."  According to Steadman, "[n]ot making any effort to consult a known and competent expert witness to evaluate the reliability of the State's expert witness['s] opinion constitutes deficient performance and fails to satisfy the objective standard of reasonableness."  We conclude that this argument fails because defense counsel *did* consult with Thompson regarding the case, and to the extent Steadman argues that counsel should have done so again after the mistrial, the record establishes that counsel's decision not to do so at that time was based on a reasonable trial strategy.  Therefore, Steadman has not shown that counsel performed deficiently.

¶17    To prevail on an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient and that the deficient

performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If a defendant fails to make a sufficient showing on one prong of this analysis, we need not address the other. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93.

¶18     To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. We strongly presume that counsel's conduct fell "within the wide range of reasonable professional assistance," and we give counsel's strategic decisions great deference. *Breitzman*, 378 Wis. 2d 431, ¶38 (citation omitted). Prejudice, on the other hand, requires the defendant to demonstrate that "but for his [or her] lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt." *State v. Sholar*, 2018 WI 53, ¶45, 381 Wis. 2d 560, 912 N.W.2d 89. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.*, ¶33 (citation omitted).

¶19     Whether the defendant was denied the effective assistance of counsel presents a mixed question of law and fact. *Breitzman*, 378 Wis. 2d 431, ¶37. We will not overturn the circuit court's findings regarding the factual circumstances of the case, defense counsel's conduct, or defense counsel's trial strategy unless those findings are clearly erroneous. *Id.* "[W]hether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo." *Id.*

¶20     At the *Machner* hearing, defense counsel explained that his decision not to call Thompson to testify was to avoid presenting inconsistent defenses.

According to defense counsel, Thompson would have testified about "improper interviewing techniques and essentially things that could have caused false memories or false beliefs to occur in [Lucy's] memory," but counsel felt that "a stronger theory of defense" was "that [Lucy] was troubled and had been running away from home and had police contact and that this was something that she made up, that she fabricated it."

¶21   Before the second trial, when the State filed its amended notice regarding Shipway's testimony, defense counsel "briefly" reconsidered calling Thompson to testify, but he decided against doing so.   According to defense counsel, he "was under the impression that the new subject matter that the State had put out there"—"essentially about the effects of trauma on a child's memory"—"was more or less accurate from a scientific point of view and thus [he] didn't think that there would be disagreement about that general idea." Defense counsel explained, however, that "in hindsight," his belief that Shipway's testimony "was generally true" was "incorrect," and he admitted that he "probably should have" asked the State to clarify "what exact opinion [Shipway] was going to have with respect to trauma and how it affects memory."

¶22   Additionally, "after seeing Ms. Shipway testify in the first trial … and actually talking to some jury members after the first trial, [counsel] did not think that Ms. Shipway was an effective witness for the State at all."   Thus, rather than call Thompson to testify, defense counsel determined that he only needed to "cross-examine [Shipway] effectively to deal with her testimony." Defense counsel also noted that he would have called Thompson to testify if Steadman had insisted, but counsel's recollection was that "Steadman deferred to [his] judgment on that or agreed with [him]."

¶23    Thompson's testimony at the *Machner* hearing addressed his disagreement with Shipway's trial testimony. In particular, Thompson agreed with Shipway's statement that trauma can change or affect the chemicals in a child's brain. But Thompson disagreed with Shipway's claims that "memory often comes back in bits and pieces and there will usually be no clarity to a child's memory after a traumatic event when it comes back in bits and pieces" and that "it's usual for a child's memory of events to change over time." According to Thompson, Shipway's assertions were "contrary to information and research in the professional literature."

¶24    As an initial matter, we agree with the circuit court's ruling that the record supports a conclusion that defense counsel made a reasonable strategic choice not to call Thompson to testify at trial and to rely on cross-examination to attack Shipway's testimony. According to the court, defense counsel consulted with Thompson and provided "an adequate, if not compelling, explanation for his choice to proceed without calling Dr. Thompson, and that his decision not to [call Thompson was] based upon trial strategy" as well as counsel's "calculation and professionalism" in deciding not to "present[] inconsistent defenses" and in counsel's "assessment of [Shipway's] performance on the witness stand." Based on these findings, Steadman cannot show deficient performance on this issue. *See Sholar*, 381 Wis. 2d 560, ¶54 ("If trial counsel testifies at the *Machner* hearing that the choice under attack was based on a trial strategy, which the circuit court finds reasonable, it is 'virtually unassailable' and the ineffective assistance claim fails." (citation omitted)); *State v. Snider*, 2003 WI App 172, ¶22, 266 Wis. 2d 830, 668 N.W.2d 784 ("Defense counsel may select a particular defense from available alternative defenses and is not required to present the jury with alternatives inconsistent with the chosen defense.").

¶25    Steadman, however, faults the circuit court for failing to address his argument that defense counsel's purported strategy was not actually his strategy because counsel argued during his closing argument that the jury "could find Mr. Steadman not guilty because either [Lucy] lied or because [Lucy] did not accurately remember what happened."  Our review of the record reveals that defense counsel appropriately explained that this alleged inconsistency was also part of his trial strategy.  According to counsel, there is a "difference" between bringing in an expert at trial and what counsel addresses during closing argument.  Defense counsel observed that during closing, his strategy was to give jurors who were not "fully converted" to Steadman's theory of defense a way to find reasonable doubt, which is different than presenting expert testimony that "is contradictory to [Steadman's] main narrative."  Counsel made a reasonably strategic choice entitled to deference, which does not undermine our conclusion that Steadman has not shown deficient performance.  *See Strickland*, 466 U.S. at 681.

¶26    As to Steadman's argument that defense counsel should have *consulted* Thompson on the question of "whether he agreed or disagreed with Ms. Shipway's proffered expert opinions concerning the effects of trauma on memory," we conclude that defense counsel had a reasonable strategic reason for not doing so.  First, as the State argues, defense counsel *did* consult with Thompson.  Thus, we are not presented with a situation where counsel entirely failed to consult an expert to aid a defendant's case.  *Cf. State v. Zimmerman*, 2003 WI App 196, ¶¶41-42, 266 Wis. 2d 1003, 669 N.W.2d 762.  Instead, Steadman asserts that defense counsel was deficient for failing to consult with Thompson *a second time*, following the State's notice of Shipway's expanded testimony.

¶27 We conclude that defense counsel's decision not to consult with Thompson again was also based on a reasonable trial strategy, which is supported by the record. With the benefit of hindsight, defense counsel acknowledged at the *Machner* hearing that he incorrectly assumed that there was general agreement among experts about the effect of trauma on a child's memory. Regardless, counsel considered that the circuit court had limited Thompson's testimony to general educational and background information, that Shipway's testimony at the first trial was unremarkable, and that Thompson's testimony may have been inconsistent with Steadman's theory of defense. In other words, even if defense counsel misunderstood Shipway's proposed expanded testimony or its accuracy, counsel's strategy was to rebut Shipway's testimony by arguing that Lucy lied. Steadman has not shown how consulting Thompson under these circumstances would have been necessary.

¶28 In essence, Steadman's argument amounts to a claim that, in hindsight, a better choice would have been for defense counsel to investigate the State's additional offer of proof as to Shipway's testimony and to consult with Thompson again, but that is not the standard by which we review ineffective assistance of counsel claims. *See, e.g.*, **State v. Mull**, 2023 WI 26, ¶49, 406 Wis. 2d 491, 987 N.W.2d 707 ("That a different trial strategy may look better in hindsight does not render a reasonable strategy deficient performance."); *see also* **State v. Thiel**, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 ("Counsel need not be perfect, indeed not even very good, to be constitutionally adequate." (citation omitted)). Steadman has not shown that defense counsel performed deficiently by failing to consult with Thompson a second time.

**II. State's Closing Argument**

¶29    According to Steadman, during the State's closing argument, it repeatedly attempted to shift the burden of proof and vouched for Lucy's credibility.  He identifies several statements the State made during its initial closing argument: "[T]he only way" to determine whether Steadman "had sexual contact with [Lucy]" is to assess her credibility; "[d]id her appearance appear to you as though she was lying to you?  Because that's what you have to find in order to find the defendant not guilty"; and the jury would "have to find" that Osimitz "is conspiring with [Lucy] to bring this case against [Steadman]."  Then, during the State's rebuttal, it argued that "[t]he only way you can find [Steadman] not guilty is if you believe [Lucy] flat out lied to you.  If she was telling the truth, then he's guilty …."

¶30    Steadman also identifies instances where the State allegedly vouched for Lucy's credibility.  During its initial closing argument, the State said: when Lucy was cross-examined "by a trained attorney who knew very well how to twist her words and her statements," Lucy "was adamant" that "Steadman had sexual contact with her and touched her, that that is the truth and that is what happened"; "[w]hat [Lucy] told you happened is what happened.  She was telling you the truth"; and "[w]e wanted to be sure [Lucy] was telling the truth," so law enforcement interviewed her and she "persisted" with her account and also "testified … under oath" that Steadman "touched [her] vagina."  During its rebuttal, the State also asserted that Lucy "told [the jury] the truth" and that, therefore, the jury should find Steadman guilty.

¶31    It is undisputed that defense counsel did not object to any of the State's alleged burden-shifting or vouching comments; thus, Steadman forfeited

his claim that the State provided an improper closing argument. *See State v. Mercado*, 2021 WI 2, ¶¶35-36, 395 Wis. 2d 296, 953 N.W.2d 337. As a result, Steadman argues that the State's improper closing argument constitutes plain error entitling him to a new trial, or, in the alternative, that defense counsel provided constitutionally ineffective assistance by failing to contemporaneously object to the State's comments. *Id.*, ¶37. For the reasons that follow, we deny both of those claims.

### a. Plain Error

¶32 Pursuant to the plain error doctrine, we may "review errors that were otherwise [forfeited] by a party's failure to object." *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77. "Plain error is 'error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time.'" *Id.* (citation omitted). We review this question de novo. *Bell*, 380 Wis. 2d 616, ¶8. The error must also be "obvious and substantial." *Jorgensen*, 310 Wis. 2d 138, ¶21 (citation omitted). If the defendant sufficiently demonstrates that an error was fundamental, obvious and substantial, then the burden shifts to the State to show the error was harmless. *State v. Mayo*, 2007 WI 78, ¶29, 301 Wis. 2d 642, 734 N.W.2d 115. "[T]he error is harmless if the beneficiary of the error proves 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.*, ¶47 (citation omitted). We "employ [the plain error] doctrine sparingly." *See Bell*, 380 Wis. 2d 616, ¶12.

¶33 As noted above, *see supra* ¶¶29-30, Steadman argues on appeal that several of the State's comments during its closing argument were "improper on multiple levels." Steadman claims that the errors in this "very close case" were

14

*fundamental* because he "has a due process right to be adjudicated based on appropriate considerations applied to the governing legal standard." He also asserts that the errors were "so *obvious* that [defense] counsel's only rationale for not objecting to repeated improper closing arguments [was] that he 'missed it.'" In addition, Steadman contends that the errors were "*substantial* in light of [Lucy's] contradictory accounts and absence of physical evidence and/or direct corroboration witnesses."[10]

¶34    As a general matter, "[c]ounsel is allowed considerable latitude in closing arguments, with discretion given to the [circuit] court in determining the propriety of the argument." *State v. Burns*, 2011 WI 22, ¶48, 332 Wis. 2d 730, 798 N.W.2d 166. A "prosecutor may 'comment on the evidence, detail the evidence, argue from it to a conclusion and state that the evidence convinces him [or her] and should convince the jurors.'" *State v. Draize*, 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979) (citation omitted). "When a defendant alleges that a prosecutor's statements constituted misconduct, the test we apply is whether the statements so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hurley*, 2015 WI 35, ¶96, 361 Wis. 2d 529, 861 N.W.2d 174. "Even if there are improper statements by a prosecutor, the statements alone will not be cause to overturn a conviction. Rather, the statements must be looked at in context of the entire trial." *Mayo*, 301 Wis. 2d 642, ¶43.

---

[10] We note that Steadman frames his plain error argument from the perspective of defense counsel's error—i.e., that "counsel's repeated failure to object to the State's improper closing arguments" satisfied the standards under the plain error doctrine. The proper analysis, however, is whether the State's error in making the improper comments during its closing argument amounted to plain error.

¶35     Steadman claims that the State attempted to shift its burden to prove all the elements of the crime beyond a reasonable doubt when it stated, "The only way you can find [Steadman] not guilty is if you believe [Lucy] flat out lied to you.  If she was telling the truth, then he's guilty …."  We agree with the circuit court and the State that our supreme court's decision in *Bell* is instructive on this issue.  There, the defendant asserted that the State made two types of improper comments during its closing argument: (1) "that the jurors had to believe [the victims] were lying before they could find [the defendant] not guilty"; and (2) "that people generally do not lie without reason, and that if the victims had no motive to lie, they should be believed."  *Bell*, 380 Wis. 2d 616, ¶41.

¶36     Our supreme court determined that neither of the State's comments were improper and that, therefore, the plain error doctrine was not applicable.  *Id.* ¶59.  According to the court, "the prosecution and defense theories of the case were mirror-images"—the State said the victims were telling the truth and the defendant said they were not—and "resolution of that contest would decide the case."  *Id.*, ¶42.  Further, the defendant "pursued a reasonable, but narrowly focused strategy" by arguing that the victims "could not be believed."  *Id.*, ¶43.  "[T]he only way [the defendant] could have won an acquittal would have been to … convince the jury that the victims lied"; therefore, the court determined that neither of the State's allegedly objectionable comments were improper because they did not shift the burden of proof in the case.  *Id.*, ¶¶47, 52-53, 59.

¶37     We agree with the circuit court that the facts in this case and *Bell* are "strikingly similar," and we rely on *Bell*'s reasoning to conclude that the State's closing argument here did not improperly shift the burden of proof.  As addressed above, defense counsel testified that Steadman's narrow theory of defense, like in *Bell*, was that Lucy was lying; and, also as in *Bell*, the State's and Steadman's

case theories were mirror images. As a result, because Steadman's case "is in the category of cases in which the verdict will necessarily follow the jury's determination of [Lucy's] credibility, the State's argument that the jurors should not find [Steadman] not guilty unless they conclude [Lucy] lied is equivalent to asking the jurors to carefully weigh [Lucy's] credibility." *See id.*, ¶51. Further, we note that rather than affirmatively attempting to shift the burden in this case, the State actually reminded the jury during its closing argument that it had the burden to prove the elements of Lucy's sexual assault "beyond a reasonable doubt." The State's comments were not improper, and, therefore, the plain error doctrine does not apply.

¶38     Steadman argues, however, that **Bell** is distinguishable because his defense counsel argued both that Lucy lied and that she may have been mistaken. We disagree. As noted above, defense counsel explained that he suggested that Lucy might be mistaken during closing argument to "soft pedal" Steadman's defense and possibly appeal to jury members who were skeptical of the defense but willing to find reasonable doubt. As the State argues, "[t]he suggestion that Lucy may have been mistaken was but a brief part of Steadman's closing argument that, at its core, was not a reasonable doubt defense but one that accused Lucy of lying."

¶39     We turn now to Steadman's claim that the State impermissibly vouched for Lucy's credibility in its closing argument. "Improper vouching occurs when a prosecutor expresses [his or] her personal opinion about the truthfulness of a witness or when [he or] she implies that facts not before the jury lend a witness credibility." **United States v. Cornett**, 232 F.3d 570, 575 (7th Cir. 2000). However, "a prosecutor is permitted to comment on the credibility of

witnesses as long as that comment is based on evidence presented." ***State v. Adams***, 221 Wis. 2d 1, 17, 584 N.W.2d 695 (Ct. App. 1998).

¶40 The State argues that its comments "that Lucy told the jurors 'the truth' [do] not, standing alone, constitute vouching" and that "[w]hen read in proper context, the prosecutor was explaining why the evidence should convince the jury that Lucy's testimony was believable." We need not address each of the State's comments, *see supra* ¶30, to determine whether they were appropriate within the context of the trial, however, because even if we assume, without deciding, that the State's comments were improper, we conclude that the State's comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *See **Hurley***, 361 Wis. 2d 529, ¶96 (citation omitted).

¶41 Steadman's defense was built on his claim that Lucy lied; therefore, the jury understood that the case turned on its assessment of Lucy's credibility. Under these circumstances, whether or not the State improperly vouched for Lucy was of no moment within the context of this trial because the entire goal of the State's case was to convince the jury that Lucy was telling the truth and the jury should believe her, and Steadman's argument was the opposite—or the mirror image—of that goal. *See **Mayo***, 301 Wis. 2d 642, ¶¶43-44; ***Bell***, 380 Wis. 2d 616, ¶18. The jury understood that was the ultimate issue—whether the State said that Lucy was telling the jury the truth or not.

¶42 Further, the circuit court instructed the jury both that "[r]emarks of the attorneys" and closing arguments are not evidence and that the jury must "[d]raw [its] own conclusions from the evidence and decide upon [its] verdict according to the evidence under the instructions given to [it] by the [c]ourt."

*See Mayo*, 301 Wis. 2d 642, ¶44; *see also* **State v. LaCount**, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780 ("Jurors are presumed to have followed jury instructions.").[11] Thus, under the circumstances, we are satisfied that even if the State improperly vouched for Lucy in its closing argument, when viewed in the context of the trial, the State's comments did not constitute plain error.[12]

### b. Ineffective Assistance of Counsel

¶43 At the **Machner** hearing, defense counsel testified regarding his failure to object to the State's closing argument. Again, in hindsight, defense counsel acknowledged that he "should have objected" to the State's comments, but he admitted that he "missed" them or did not notice them and had no strategic reason for not objecting.

¶44 On appeal, Steadman argues that defense counsel's "[c]umulative[]" errors—that is, counsel's failure to consult with Thompson a second time and failure to object to the State's improper closing argument—prejudiced Steadman. Steadman asserts that "the State's case featured a number of 'evidentiary deficiencies and inconsistencies' with no direct witnesses corroborating the

---

[11] Steadman argues that the jury instructions "are not legally sufficient to cure the prejudicial impact of improper argument." Steadman cites **Jordan v. Hepp**, 831 F.3d 837, 849 (7th Cir. 2016), for this proposition, but he fails to develop an argument regarding the application of that federal case to the circumstances here. We need not address undeveloped arguments. *See* **State v. Pettit**, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

[12] Because we conclude that the State's comments did not rise to the level of plain error, we need not address the State's argument on appeal that the alleged error was harmless. *See* **Patrick Fur Farm, Inc. v. United Vaccines, Inc.**, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (court of appeals decides cases on the narrowest possible grounds).

specific alleged events at the time [Lucy] testified those events occurred."[13] Therefore, he concludes that defense counsel's failure to object to the comments during the State's closing argument "objectively demonstrates a reasonable probability" of "a different outcome in light of the evidentiary deficiencies and inconsistencies in the State's case."

¶45 Defense counsel's failure to object to the State's purported burden-shifting and vouching comments does not undermine our confidence in the outcome of the trial. *See Sholar*, 381 Wis. 2d 560, ¶33. As previously addressed in detail above, this case hinged on Lucy's credibility, and the jury understood that.[14] Lucy testified in detail regarding her memory of the sexual assault and the circumstances surrounding it, and the State also presented witnesses in support of certain aspects of her testimony. In contrast, defense counsel highlighted inconsistencies in Lucy's statements and cross-examined the State's witnesses on these inconsistencies. Defense counsel also cross-examined the detective about his failure to adequately investigate aspects of Lucy's claims relating to her credibility. Further, defense counsel argued to the jury that Lucy's story was "implausible" and that Lucy made up this story because "[s]he was confused,

---

[13] Steadman cites *State v. Smith*, 2003 WI App 234, ¶¶19, 22, 268 Wis. 2d 138, 671 N.W.2d 854, for this proposition. Steadman then generally compares this case to *Smith*—where the State suggested during its closing argument "that testifying police officers may have lied"—based on, according to him, "how close the credibility call was" in both cases. *See id.*, ¶¶22, 25. Steadman's arguments are entirely conclusory. He fails to develop an argument as to how the factual circumstances in *Smith* are similar to those here, which is particularly important given the *Smith* court's statement that "[t]he line between permissible and impermissible final argument is not easy to follow and is charted *by the peculiar circumstances of each trial*." *Id.*, ¶23 (emphasis added). Accordingly, we will not further address this argument. *See Pettit*, 171 Wis. 2d at 646-47.

[14] We incorporate our plain error analysis above, *see supra* ¶41, as support for our conclusion that Steadman suffered no prejudice.

depressed and anxious"; "[s]he had run away from home at some point"; "[s]he was grounded at some point"; "[t]here was police contact"; and the "further [her accusation got], the harder it [was] to walk back." In other words, Steadman squarely placed Lucy's credibility before the jury, and the jury had ample opportunity to weigh Lucy's credibility and conclude that she was telling the truth, regardless of the State's comments made during closing arguments.

¶46     Finally, we conclude that Steadman's allegation that the cumulative effect of defense counsel's errors amounts to prejudice also fails. *See **Thiel***, 264 Wis. 2d 571, ¶60. We determined above that defense counsel did not perform deficiently by failing to consult with Thompson a second time. *See supra* ¶¶26-28. Accordingly, there is no prejudice to accumulate. "Zero plus zero equals zero." ***State v. Brown***, 85 Wis. 2d 341, 353, 270 N.W.2d 87 (Ct. App. 1978) (citation omitted). Steadman has not met his burden to prove that "but for his lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt." *See **Sholar***, 381 Wis. 2d 560, ¶45.

## III.  Evidence of Bias

¶47     Steadman's final argument is that the circuit court erred by denying him the right to cross-examine Osimitz about her alleged bias resulting from Noelle's "custody battle" with Steadman. Evidence that a witness is biased is admissible to attack that witness's credibility. *See* WIS. STAT. § 906.16 ("For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible."); ***Rogers v. State***, 93 Wis. 2d 682, 689, 287 N.W.2d 774 (1980). "The bias or prejudice of a witness is not a collateral issue and extrinsic evidence may be used to prove that a witness has a motive to testify falsely. The extent of the inquiry with respect to

bias is a matter within the discretion of the [circuit] court." ***State v. Williamson***, 84 Wis. 2d 370, 383, 267 N.W.2d 337 (1978), *abrogated on other grounds by* ***Manson v. State***, 101 Wis. 2d 413, 304 N.W.2d 729 (1981).

¶48    We review the circuit court's decision to limit testimony on cross-examination for an erroneous exercise of discretion. ***State v. Rhodes***, 2011 WI 73, ¶¶22-23, 336 Wis. 2d 64, 799 N.W.2d 850. The court's "exercise of discretion will be sustained if [it] reviewed the relevant facts; applied a proper standard of law; and using a rational process, reached a reasonable conclusion." ***State v. Davidson***, 2000 WI 91, ¶53, 236 Wis. 2d 537, 613 N.W.2d 606. We review de novo the question of whether the court relied on the appropriate and applicable law—in this context, the constitutional right accorded under the Confrontation Clause. *See* ***Rhodes***, 336 Wis. 2d 64, ¶25.

¶49    During Osimitz's cross-examination, defense counsel asked her about Steadman and Noelle's custody dispute, and the State objected on the ground of relevancy. The circuit court sustained the objection, causing defense counsel to request a sidebar. Defense counsel argued that

> [Osimitz] is aware that there are disputes regarding child custody between her daughter and [Steadman]. I think that goes to her credibility. She has a reason to be biased or to have a grudge against Mr. Steadman because her daughter is fighting him in court on a different matter.

The court agreed that general questions about Noelle and Steadman's divorce disputes were "probably appropriate," but the court observed that "the fact that there is a child custody issue is not the relevant portion." After continued discussion about what questions would be appropriate, the court declared: "I don't want to get into child custody stuff. I don't think that's relevant, because I didn't know where you were going with that." The court upheld its ruling sustaining the

22

State's objection on relevancy grounds. Defense counsel then agreed to leave questions on the issue "vague."

¶50 When Osimitz's testimony resumed, defense counsel questioned Osimitz as to whether "there are some things that are being fought" in Steadman and Noelle's divorce case. Osimitz first repeatedly answered, "No," and when defense counsel rephrased his questions and continued to press, Osimitz testified that she "d[idn]'t know" whether her daughter and Steadman "agree on everything in the divorce." She conceded, however, that the divorce was "still pending."

¶51 On appeal, Steadman argues that Osimitz's alleged "bias arising from [Noelle's] custody battle with" Steadman was relevant to Osimitz's credibility, and the circuit court erroneously exercised its discretion by sustaining the State's objection to Steadman's question on cross-examination. According to Steadman, Noelle's placement time and custody with her and Steadman's son would "directly impact[] how much time [Osimitz] would be able to spend with her grandson." Steadman asserts that "[w]ithout [him] being able to 'make a record' of why [Osimitz] had motive to testify falsely, the jury[] lacked essential facts necessary to evaluate the scope of [Osimitz's] bias and assess her credibility." *See **Davis v. Alaska***, 415 U.S. 308, 318 (1974). Steadman further asserts that the court erred by sustaining the State's objection on the ground of "relevancy" because the court "did not explain how the proffered evidence lacked materiality to a 'consequential' fact such as [Osimitz's] credibility."

¶52 The law in this state is clear that "[t]he right to cross-examination, and thereby confrontation, is not … absolute" and does not "prevent[] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." ***Rhodes***, 336 Wis. 2d 64, ¶¶32, 39 (citation omitted). "On

23

the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about" the danger of unfair prejudice and confusion of the issues. *Rhodes*, 336 Wis. 2d 64, ¶¶39-40, 46 (citation omitted).

¶53     We conclude that the circuit court did not erroneously exercise its discretion when it sustained the State's objection to Steadman's question.  We first note that the court did not disallow all questions regarding disputes between Noelle and Steadman in the divorce; instead, it permitted cross-examination on Osimitz's knowledge of general disputes in the divorce action, likely, as the State argued, because "the court recognized that such questions were probative of Osimitz's credibility."  Thus, unlike in *Davis*—where the prosecution's key witness (who connected the defendant to a stolen safe) was on probation after being adjudicated delinquent for burglary and the lower court prevented *any* reference to the witness's juvenile record, *Davis*, 415 U.S. at 310-11, 318—the court in this case did not exclude all evidence of the source of Osimitz's alleged bias.

¶54     Further, the circuit court's decision to limit the scope of the questions on cross-examination demonstrates, to this court, the balancing required to exclude the evidence.  *See State v. Gary M.B.*, 2004 WI 33, ¶26, 270 Wis. 2d 62, 676 N.W.2d 475 ("[A]n appellate court can … affirm[] if the record indicates that balancing is implicit from the circuit court's determination.").  By disallowing specific questions about the child custody dispute, but allowing general questions about Osimitz's knowledge of disputes between Noelle and Steadman, the court implicitly determined that the custody dispute evidence, while relevant, suffered from its "probative value" being "substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury." *See* WIS. STAT. § 904.03.

¶55 We agree with the State that the circuit court's "comment that it 'didn't know where [defense counsel] was going' with his custody question suggests that the court was concerned that, without more information, it wanted to avoid the risk that the jury would hear evidence excludable under [WIS. STAT. §] 904.03." Rather than expand on "where" defense counsel was "going" with the cross-examination—i.e., by providing the court with additional details about the custody dispute and how it was relevant and more probative than prejudicial, *see* WIS. STAT. § 901.03(1)(b)—counsel said, "Fair. I understand." Without more information, the court reasonably exercised its discretion by allowing Steadman to ask Osimitz about Noelle and Steadman's pending divorce while prohibiting questions about the child custody dispute, and we affirm on this issue.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.